UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 12-36187 |
| ATP OIL & GAS CORPORATION | CHAPTER 11 |
| DEBTOR | |

| | |
|---|---|
| HORNBECK OFFSHORE SERVICES, LLC, | ADVERSARY NO. |
| PLAINTIFF, | |
| V. | |
| ATP OIL & GAS CORPORATION, CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH AND THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A. | |
| DEFENDANTS | |

### COMPLAINT TO DETERMINE VALIDITY, AMOUNT, AND PRIORITY OF LIENS AND REQUEST FOR DECLARATORY JUDGMENT OF HORNBECK OFFSHORE SERVICES, LLC

Hornbeck Offshore Services, LLC ("**Hornbeck**"), files this Complaint to Determine Validity, Amount and Priority of Liens and Request for Declaratory Judgment ("**Complaint**") and respectfully shows the Court as follows:

### PARTIES

1.      Plaintiff, Hornbeck, is a Delaware limited liability company in good standing and with its principal place of business in Covington, Louisiana.

1

2.     Defendant, ATP Oil & Gas Corporation (the "**Debtor**" or "**ATP**") is a Texas corporation with its principal place of business in Houston, Texas. ATP is the debtor-in-possession in the underlying bankruptcy case, Case No. 12-36187, pending before this Court.

3.     Defendant, Credit Suisse AG, Cayman Islands Branch ("**Credit Suisse**"), is upon information and belief, a branch of a foreign bank, and may be served with process in accordance with Federal Rule of Bankruptcy Procedure 7004(b)(3) by mailing a copy of the summons and Complaint to Credit Suisse AG, Cayman Islands Branch, One Madison Avenue, 2nd Floor, New York, NY 10010, Attn: Loan Operations-Boutique Management, Primary Contact: Nirmala Durgana.

4.     Defendant, The Bank of New York Mellon Trust Company, N.A. ("**BNY**") is a national banking association that may be served in accordance with Federal Rule of Bankruptcy Procedure 7004(h) by mailing a copy of the summons and Complaint to its registered agent for service of process in the State of Texas, CT Corporation System, 350 N. St. Paul St., Suite 2900, Dallas, Texas 75201-4234.

## JURISDICTION AND VENUE

5.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157, 1334 and 2201, *et seq*.

6.     This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (K).

7.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.     This Complaint is brought pursuant to Rules 3012 and 7001 of the Federal Rules of Bankruptcy Procedure and pursuant to 11 U.S.C. § 506 and 28 U.S.C. §§ 2201-

2

2202.

9. Pursuant to Local Bankruptcy Rule 7008-1, Hornbeck does not consent to the entry of final orders or judgment by the Bankruptcy Judge if it is determined that the Bankruptcy Judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## PROCEDURAL AND FACTUAL BACKGROUND

### A. Bankruptcy of the Debtor

10. On August 17, 2012 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Court**").

### B. Hornbeck's Claims against the Debtor and Liens and Privileges Against the Subject Properties

11. On May 1, 2007, ATP and Hornbeck entered into an agreement entitled Master Time Charter Agreement For US Gulf of Mexico Operations ("**Time Charter Agreement**") whereby Hornbeck agreed to charter its vessels to ATP subject to the terms and conditions set forth in the Time Charter Agreement. A true and correct copy of the Time Charter Agreement is attached hereto as Exhibit "A", whose terms are incorporated herein as if set forth in extenso.

12. Shortly thereafter, Hornbeck began providing goods, personnel, towing and transportation services to ATP on certain wells located within federal oil and gas lease blocks within the Outer Continental Shelf—Gulf of Mexico (collectively, the "**OCS Leases**"): a) A-1 Well (API Well No. 608174115100) on OCS Lease No. G-16661, Mississippi Canyon, Block 941; b) A-2 Well (API Well No. 608174115202) on OCS

3

Lease No. G-16661, Mississippi Canyon, Block 941 (collectively, "**MC 941**"); c) A-3 Well (API Well No. 608184004100) on OCS Lease No. G-24130, Mississippi Canyon, Block 942 ("**MC 942**"); d) A-3 Well (API Well No. 608184004100) on OCS Lease No. G-13198, Atwater Valley, Block 63 ("**AT 63**") (MC 941, MC 942 and AT 63 are collectively referred to as the "**Telemark Properties**"); and e) wells on OCS Lease No. G-22939, Green Canyon, Block 300 ("**GC 300**") (GC 300 is part of the "**Clipper Properties**") (the Telemark Properties and Clipper Properties are collectively referred to as the "**Subject Properties**").

13. From at least November 27, 2009 ("**Lien Inception Date**") until August 17, 2012, there was never a period of ninety (90) days or more between services provided by Hornbeck to ATP.

14. ATP failed to pay Hornbeck for services that it provided on the Subject Properties and OCS Leases from February 22, 2012 to August 17, 2012 in the aggregate amount of $4,775,478.94.

15. Specifically, the following table sets forth the date upon which Hornbeck began providing labor, equipment, services and supplies to the Debtor in support of the Debtor's development, exploration, maintenance and operations, including drilling, completion, testing and production of the Subject Properties:

| Entity Name | Lien Inception Date | Relevant Property |
|---|---|---|
| Hornbeck | 11/27/09 | MC 941; MC 942; AT 63 and GC 300 |

16. On September 14, 2012, Hornbeck recorded its lien with the Clerk of

4

Court for Plaquemines Parish, State of Louisiana on all of the Subject Properties except on GC 300. See Notice of Perfection, Continuation or Maintenance of Liens filed by Hornbeck in Bankruptcy Case (Doc. # 604) and exhibits attached thereto.

17. On September 14, 2012, Hornbeck recorded its lien with the Clerk of Court for the First Judicial District Court for the County of Harrison, State of Mississippi on all of the Subject Properties except GC 300. *Id.*

18. On September 14, 2012, Hornbeck recorded its lien with the Chancery Clerk for the County of Hancock, State of Mississippi on all of the Subject Properties except GC 300. *Id.*

19. On September 14, 2012, Hornbeck recorded its lien with the Chancery Clerk for the First Judicial District Court for the County of Jackson, State of Mississippi on all of the Subject Properties except GC 300. *Id.*

20. On September 14, 2012, Hornbeck recorded its lien with the Clerk of Court for Terrebonne Parish, State of Louisiana on GC 300. See Supplemental and Amended Notice of Perfection, Continuation or Maintenance of Liens filed by Hornbeck in Bankruptcy Case (Doc. # 700) and exhibits attached thereto.

21. On September 17, 2012, Hornbeck recorded its lien with the Clerk of Court for Lafourche Parish, State of Louisiana on GC 300. *Id.*

22. On October 12, 2012, Hornbeck filed its Notice of Perfection, Continuation or Maintenance of Liens filed by Hornbeck in the Bankruptcy Case (Doc. # 604). This Notice of Perfection, Continuation or Maintenance of Liens related to the liens recorded on September 14, 2012 in Plaquemines Parish, Hancock County, Harrison County and Jackson County affecting MC 941, MC 942 and AT 63.

23. On October 24, 2012, Hornbeck filed its Supplemental and Amended Notice of Perfection, Continuation or Maintenance of Liens in the Bankruptcy Case (Doc. # 700). This Supplemental and Amended Notice of Perfection, Continuation or Maintenance of Liens related to the liens recorded on September 14 and 17, 2012 in Terrebonne and Lafourche Parishes affecting GC 300.

24. On October 24, 2012, Hornbeck filed its Supplemental and Amended Notice of Perfection, Continuation or Maintenance of Liens in the Bankruptcy Case (Doc. # 705). This Supplemental and Amended Notice of Perfection, Continuation or Maintenance of Liens related to the liens recorded on September 14, 2012 in Plaquemines Parish, Hancock County, Harrison County and Jackson County affecting MC 941, MC 942 and AT 63.

C. **Credit Suisse Mortgage**

25. On June 18, 2010, ATP entered into a Credit Agreement, as subsequently amended, supplemented, modified and/or Restated (the "**Credit Agreement**"), between ATP and Credit Suisse as administrative and collateral agent, which, *inter alia*, provided for initial term loans of $150 million. Among other things, in connection with the Credit Agreement, ATP executed that certain Act of Mortgage, Security Agreement, Financing Statement, Fixture Filing and Assignment of Production from ATP Oil & Gas Corporation to Credit Suisse AG, as collateral agent ("**Credit Suisse Mortgage**"), dated June 18, 2010 which was recorded in the mortgage records of Plaquemines Parish, Louisiana on June 21, 2010. Pursuant to an intercreditor agreement by and between, *inter alia*, ATP, BNY and Credit Suisse, the liens and mortgages granted under the BNY

Mortgage[1] are subordinate to the liens and mortgages granted under the Credit Suisse Mortgage.

**D. BNY Mortgage**

26. On April 23, 2010, ATP issued and sold $1.5 billion of 11.875% senior second lien notes (aggregate principal amount), pursuant to an Indenture between ATP and BNY, as Trustee. Among other things, in connection with the Indenture, ATP executed that certain Act of Second Lien Mortgage, Security Agreement, Financing Statement, Fixture Filing and Assignment of Production from ATP Oil & Gas Corporation to the Bank of New York Mellon Trust Company, N.A., as collateral agent, dated April 23, 2010 ("**BNY Mortgage**"), which was recorded in the mortgage records of Plaquemines Parish, Louisiana on May 3, 2010.

**E. ORRI and NPI Conveyances**

27. After the Lien Inception Date and both prior to and after the recordation date of the BNY and Credit Suisse mortgages, ATP assigned and transferred certain term overriding royalty interests and net profits interests out of ATP's operating interests in the Subject Properties ("**ORRI and NPI Conveyances**").

28. In connection with the ORRI and NPI Conveyances, BNY and Credit Suisse executed certain subordination agreements and/or acts of subordination under which the mortgages and liens granted in favor of BNY and Credit Suisse were subordinated and/or released in order to allow for the conveyance of the subject interests to the purchaser and/or assignees of same. However, at no time did Hornbeck execute any act to subordinate, release or otherwise waive any of its statutory privileges and liens which encumber the Subject Properties.

---

[1] Defined below.

7

F.  **DIP Financing and DIP Credit Agreement**

29. As part of its first-day motions, the Debtor filed an *Emergency Motion for Entry of Interim and Final Orders Pursuant to Bankruptcy Code Sections 105, 107(b), 361, 362, 363, 364 and 507 (1) Approving Postpetition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting Liens and Providing Superpriority Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, (6) Authorizing Debtor to File the Fee Letter Under Seal and (7) Scheduling a Final Hearing* (the "**DIP Motion**") (Doc. # 21).

30. This Court entered the Interim Order on the DIP Motion August 22, 2012 (Doc. # 126), which was supplemented by the Supplemental Order entered on the same date (Doc. # 128).

31. On September 20, 2012, following the final hearing on the DIP Motion during which the Debtor advised of the need to amend the DIP Credit Agreement to modify certain covenants, the Court entered its Final Order (Doc. # 440) approving the DIP Motion and authorizing the Debtor to enter into Amendment No. 1 to the DIP Credit Agreement.

32. Following the subsequent failure of the Debtor to satisfy certain conditions under the DIP Credit Agreement, as amended, the Debtor filed its *Motion for Entry of An Order Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, 364 and 507 Authorizing the Debtor to Enter Into Amendment No. 2 to the DIP Credit Agreement* (Doc. # 910).

33. The Court approved and authorized the Debtor to enter into the Amendment No. 2 to the DIP Credit Agreement on December 6, 2012 (Doc. # 986).

34. On February 1, 2013, as a result of further covenant defaults under the DIP Credit Agreement, as amended, including the failure to achieve production of the MC 942-A-3 Sand Well by January 2, 2013 – which resulted in the termination of approximately $50 million in DIP loan availability under Amendment No. 2 – the Debtor filed its *Emergency Motion for Entry of an Order Authorizing the Debtor to Enter Into Amendment No. 3 to the DIP Credit Agreement* (Doc. # 1311).

35. After several Court hearings and a number of modifications, on February 21, 2013, the Court approved and authorized the Debtor on a final basis to enter into Amendment No. 3 to the DIP Credit Agreement (Doc. # 1489).

36. The original DIP Credit Agreement provided for funding for a roll-up of the pre-petition first lien debt under the Credit Agreement of approximately $367 million and additional funding of $250 million which was to be used for two capital expenditure projects – Clipper and Gomez No. 9 and for general and administrative (G&A) and bankruptcy administration expenses. During the course of the bankruptcy case, the actual amounts for the Clipper Project, G&A and bankruptcy administration expenses have far exceeded the budgeted and projected costs. As a result, among other things, the Gomez No. 9 well was never drilled and ultimately the Gomez Properties were shut-in.

37. As of May 2013, the Debtor upon information and belief, had drawn approximately $700 million under the DIP facility, as amended, inclusive of the roll-up of pre-petition indebtedness of approximately $367 million. Further, upon information and belief, the cost and expense to the estate of the DIP facility is in excess of $140 million, not including certain non-public fees and charges.

38. In connection with each debtor-in-possession financing request, Hornbeck

and other similarly situated statutory lien creditors, asserted objections to, *inter alia*, preserve the rank and priority of their respective statutory liens and privileges vis-à-vis the DIP Liens (as defined in the Interim Order) that were granted in favor of the DIP Lenders.

39. As a result, each of the Orders entered by the Court (collectively, the "**DIP Financing Orders**") with respect to debtor-in-possession financing (the "**DIP Financing**"), included provisions which, *inter alia*, specifically preserved the rank and priority of statutory liens that (a) were valid, enforceable and non-avoidable against property that did not constitute Prepetition Collateral (as defined in the Interim Order) (the "**Senior Statutory Liens**"); or (b) were valid, enforceable, non-avoidable and senior in priority to the Prepetition First Liens (as defined in the Interim Order) encumbering the Prepetition Collateral (the "**Senior Prior Liens**") (as defined in the Interim Order).

**G.    Sale Motion**

40. On January 22, 2013, the Debtor filed its Emergency Motion Pursuant to 11 U.S.C. §§ 105(a), 363 and 365 and Bankruptcy Rules 2002, 6004 and 6006 for Orders (I)(A) Approving (i) Bidding Procedures; (ii) Bid Protections; (iii) Auction Procedures; and (iv) Assumption and Assignment Procedures; (B) Approving Notice Procedures for (i) the Solicitation of Bids; and (ii) an Auction; (C) Scheduling Hearings on Approval of a Sale or Sales of Substantially all of the Debtors Deepwater Property Assets; and (D) Granting Related Relief; and (II) (A) Approving the Sale or Sales of Substantially all of the Debtors Deepwater Property Assets Free and Clear of Claims and Liens and (B) Approving the Assumption and Assignment of Contracts and Leases, by which it sought

to market and sell the Debtor's deepwater property assets, including some of the Subject Properties (Doc. # 1256) ("**Sale Motion**").

41. On February 11, 2013, the Statutory Lien Objectors filed a limited objection and reservation of rights (Doc. # 1386) with respect to the Sale Motion, objecting to the request by the Debtor that "[t]he liens of the DIP Lenders shall attach to the proceeds of the Sale of the Deepwater Assets" and that the Debtor be authorized to use such proceeds to repay the DIP Lender, on the basis that such request was in derogation of the protections and rights existing in favor of the holders of Senior Statutory Liens and Senior Prior Liens as set forth in the DIP Financing Orders[2].

42. The Statutory Lien Objectors further objected to the DIP Lenders exercising any right to credit bid on the Deepwater Assets without a requirement that the holders of Senior Statutory Liens or Senior Prior Liens be paid in cash at closing or at such time that this Court determines the priority of liens.

43. Following a hearing on the Sale Motion on February 14, 2013, the Court entered its Order (A) Approving (i) Bidding Procedures; (ii) Bid Protections; (iii) Auction Procedures; and (iv) Assumption and Assignment Procedures; (B) Approving Notice Procedures For (i) The Solicitation of Bids; and (ii) an Auction; (C) Scheduling Hearings on Approval of a Sale or Sales of Substantially All of Debtor's Deepwater Property Assets; and (D) Granting Related Relief (Doc. # 1419) (the "**Sale Procedures Order**").

44. The Sale Procedures approved by the Court and attached to the Sale Procedures Order as Exhibit 1 specifically provided that,

> Notwithstanding the foregoing, any credit bid by the DIP Lenders or the Prepetition Second Lien Trustee that is the Successful Bid with respect to all or a portion of the Deepwater Assets shall result in a sale of those

---

[2] *See* Doc. # 1386, at para. 13.

11

assets that is subject to (i) any Senior Statutory Liens (as defined in the Final DIP Order entered by the Court [Dkt. 440] and (ii) any Senior Prior Liens (as defined in the Final DIP Order entered by the Court [Dkt. 440]) on the assets purchased to the extent that the claims securing such Senior Statutory Liens or Senior Prior Liens are not paid in cash in full upon closing of the sale.[3]

45. On May 7, 2013, the Debtor filed its Notice of Debtor's Designation of Successful Bid (Doc. # 1816) designating the credit bid submitted by Credit Suisse AG, as Administrative Agent and Collateral Agent (the "**DIP Agent**"), as the Successful Bid (as defined in the Bidding Procedures). The Debtor did not designate a Backup Successful Bidder.

46. On June 20, 2013, the Debtor filed an executed Asset Purchase Agreement ("**APA**") between the Debtor and the DIP Agent.

47. The APA provides, inter alia, that the DIP Agent will pay $55,000,000.00 "to satisfy legitimate Liens on Assets that are ranked senior to the DIP Claims…" See APA, Section 3.01 at p. 21. "DIP Claims" are defined as "(i) the aggregate principal amount of obligations outstanding under the DIP Credit Agreement, together with accrued interest and any other Claim with respect to the DIP Credit Agreement, (ii) the aggregate principal amount of obligations outstanding under the Prepetition Hedge Obligations that rank pari passu with the DIP Credit Agreement and (iii) any Liens securing the foregoing." *Id.*, Section 1.01 at p. 6. The "Prepetition Hedge Obligations" include the Credit Suisse Mortgage. *Id.*, Section 1.01 at p. 14

48. The Credit Suisse Mortgage and the BNY Mortgage are part of the "Debt Facilities" to be assumed by the DIP Lenders under the APA. *Id.*, Sections 1.01 and 10.01(h) at pp. 5 and 46.

---

[3] *See* Exhibit 1 to Sales Procedures Order, at p. 7.

### H. Notice of Default under DIP Credit Agreement and DIP Financing Termination

49. On June 7, 2013, the DIP Lenders served the Debtor with a DIP Termination Declaration and Carve Out Trigger Notice ("**Termination Notice**"), which, *inter alia*, terminated the Debtor's ability to use Cash Collateral and invoked the Carve Out (as defined in the Final DIP Order).

50. Thereafter, the Debtor filed several motions seeking authority to use Cash Collateral, which were approved by the Court in three (3) separate Interim Cash Collateral Orders. See Docs. #2000, 2103 and 2149. Through the Interim Cash Collateral Orders, the Debtor obtained Court approval for use of cash collateral on an interim basis for the periods beginning June 10, 2013 through June 21, 2013 (Doc. # 2000), from June 21, 2013 through June 28, 2013 (Doc. # 2103) and from June 28, 2013 through the date of the final sale hearing (Doc. # 2149), in accordance with the budgets attached thereto.

## CAUSES OF ACTION

### COUNT I
### (Determination of Existence, Validity, Amount and Priority of Hornbeck's liens)

51. Hornbeck incorporates each allegation set forth above as though restated herein in extenso.

52. As set forth above, Hornbeck holds valid and perfected statutory liens and privileges under the Louisiana Oil Well Lien Act, La. R.S. § 9:4861, *et seq.* ("**LOWLA**"), which fully secures the principal amount of ATP's indebtedness to Hornbeck, interest thereon, reasonable attorneys' fees not to exceed 10%, and the cost of preparing and filing the Statement of Privilege and Notice of Lis Pendens. Further, Hornbeck's statutory privileges and liens are "Senior Liens" under the terms of the DIP

Financing Orders and proposed Final Sale Order.

53. Accordingly, Hornbeck seeks a declaratory judgment establishing the extent, validity and amount of its statutory privilege and allowed secured claim.

## COUNT II
**(Request for Declaratory Judgment against Credit Suisse Mortgage, BNY Mortgage and DIP Liens)**

54. Hornbeck incorporates each allegation set forth above as though restated herein in extenso.

55. As set forth above, a valid case or controversy exists at this time for this Court to declare the rights and remedies of Hornbeck and the Defendants in this Adversary Proceeding.

56. Hornbeck seeks a declaratory judgment that their statutory liens and privileges are senior to the Credit Suisse Mortgage, the BNY Mortgage and the DIP Liens under the DIP Credit Agreement and DIP Financing Order.

57. Furthermore, pursuant to 28 U.S.C. §§ 2201-2201, upon final approval of the Sale by the Court, Hornbeck requests that this Court order payment of Hornbeck's liens, including attorneys' fees and costs, in full pursuant to the terms of the APA and in accordance with applicable statutory provisions.

## COUNT III
**(Recovery of Attorneys' Fees and Costs)**

58. Hornbeck incorporates each factual allegation set forth above as though restated herein in extenso.

59. Pursuant to Section 506(b) of the Bankruptcy Code and LOWLA, Hornbeck seeks recovery of all reasonable attorneys' fees up to 10% and costs incurred in preparing and enforcing their statutory privileges and lien claims and underlying

obligations related thereto in this proceeding.

**WHEREFORE**, the plaintiff, Hornbeck Offshore Marine Services, LLC prays:

1. That its Complaint be deemed good and sufficient and that it be filed according to law; and

2. A summons be issued herein to ATP Oil & Gas Corporation, Credit Suisse AG, and The Bank of New York Mellon Trust Company, N.A., compelling each to appear and respond to this Complaint or suffer a default; and

3. For a judgment, holding that Hornbeck Offshore Marine Services, LLC has valid, properly perfected, first priority LOWLA liens in the Subject Properties in the sums provided above; and

4. That the Defendants be ordered and directed to pay or otherwise turnover the sum of Hornbeck Offshore Marine Services, LLC's LOWLA liens to Plaintiff upon approval of the APA by the Court; and

5. For such other and further relief to which it may be entitled in law and in equity.

Dated: August 26, 2013.

Respectfully submitted,

ADAMS AND REESE LLP

/s/ *Robin B. Cheatham*
Robin B. Cheatham (So. District No. 18036)
Scott R. Cheatham Tex Bar No. 24050406
One Shell Square
701 Poydras Street, Suite 4500
New Orleans, Louisiana 70139-4500
Telephone: (504) 581-3234
Telecopier: (504) 566-0210
Email: robin.cheatham@arlaw.com
*Counsel for Hornbeck Offshore Marine Services, LLC*